UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JOEL MOLINA TORRES and<br>EDGARDO RIVERA,<br><br>      Plaintiffs<br><br>      v.<br><br>BURLINGTON COAT FACTORY<br>DIRECT CORPORATION, d/b/a<br>BURLINGTON COAT FACTORY, *et al.*,<br><br>      Defendants | 1:09-cv-00594-GZS |

## RECOMMENDED DECISION

Plaintiffs Joel Molina Torres and Edgardo Rivera, both of Puerto Rican ancestry, contend that the Burlington Coat Factory Defendants fired them because of negative stereotypes held by a decision maker about Puerto Ricans. The Defendants say that it just isn't so and explain that Plaintiffs were terminated because they and/or their wives purchased store gift cards from a customer at substantially reduced prices under suspicious circumstances. Defendants filed a motion for summary judgment and the Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636. Because the material factual disputes in this case boil down to swearing contests and because a genuine issue exists whether a decision maker made pejorative ethnic statements to the Plaintiffs during the interview that lead to their termination, I recommend that the Court deny the summary judgment motion.

### STATEMENT OF FACTS

The following factual statement is drawn from the parties' statements of material facts submitted and construed in accordance with District of Maine Local Rule 56. The relevant

documents are the Defendants' Statement of Material Facts (Doc. No. 22), the Plaintiffs' Response to Defendants' Statement and Statement of Additional Material Facts (Doc. No. 30), and the Defendants' Reply Statement (Doc. No. 37).

The Burlington Coat Factory defendants (collectively, "BCF"[1]) operate a retail store in Bangor, Maine. Plaintiff Edgardo Rivera worked in that store as a maintenance associate beginning in November 2005. Plaintiff Joel Molina Torres joined the store as a receiving associate in May 2007. Molina and Rivera (collectively, "Plaintiffs") never worked the registers or handled customer returns. BCF terminated their employment on November 23, 2007, under the circumstances described below. (Defs.' Statement ¶¶ 5-7; Pls.' Additional Statement ¶¶ 7, 17.)

During the time period under consideration, Amy Shepherd served as store manager, Edward Mulvey served as the district manager, Melissa Foley served in "regional loss prevention," and Robin Bombardier served as "regional human resources business partner." (Defs.' Statement ¶¶ 1-4.) As of the date of discharge, Rivera had worked in the store for two years and Shepherd considered him an excellent employee, but Molina had only worked in the store for roughly half a year and Shepherd's assessment of him is limited to an observation that he performed his job. (Pls.' Additional Statement ¶¶ 9, 11, 15, 18.) Molina and Rivera were the only Spanish-speaking employees and the only Hispanic employees in the Bangor store. (Id. ¶ 20.) Shepherd and Ron Riley, the warehouse supervisor, encouraged Molina and Rivera to use English when speaking in the store. (Id. ¶¶ 22-23.)

BCF store employees and their immediate family members receive a ten percent employee discount on purchases made at BCF stores. (Defs.' Statement ¶ 17; Pls.' Additional

---

[1] Although multiple Burlington Coat Factory entities are listed on the docket, I treat BCF as a singular noun for reading purposes, consistent with the parties' usage.

Statement ¶ 42.) In addition to offering coats and other goods for sale, BCF offers gift cards for purchase. (Defs.' Statement ¶ 12.) Gift cards can pay for merchandise, but they cannot be redeemed for cash. (Id. ¶ 14.) In addition to offering gift cards for purchase, BCF also issues gift cards to individuals who return merchandise without a register receipt, subject to certain conditions. (Id. ¶ 16; Register POS and Front End Manual § 14.4, Foley Dep. Ex. 12.) BCF admits that register clerks retained discretion whether to accept items returned without a receipt. (Pls.' Additional Statement ¶ 25; Defs.' Reply ¶ 25.) Two factors a clerk might consider are whether an item is in new condition and, if the return does not seem legitimate, whether the item was previously in BCF inventory (nationwide) and sold by BCF. Attempting to determine the latter is a time consuming process. The cost of the item(s) is another factor that might be considered. (Pls.' Additional Statement ¶¶ 26, 28; Mulvey Dep. at 51-52.[2])

BCF has a loss prevention policy that requires personnel to report suspicious activity to management. (Defs.' Statement ¶¶ 58-59.) When they began employment with BCF, Molina and Rivera both signed acknowledgements that they received, read, and understood a document entitled Burlington Coat Factory Code of Business Conduct and Ethics. (Id. ¶ 60.) They also signed acknowledgements that they received employee handbooks, which describe the same duty to safeguard BCF's assets and report suspicious circumstances. (Id. ¶¶ 61-62.) The documents received by Plaintiffs were written in English. Rivera offers a qualification that he did not read or write English at the time and only began learning English in 2005. Molina merely states that Spanish is his native language. Molina moved to the United States from Puerto Rico when he

---

[2] Plaintiffs suggest that a clerk could readily determine whether an item was taken into another store's inventory, but the cited deposition testimony does not really support that inference. (Pls.' Additional Statement ¶ 27; Foley Dep. 67-73.) This is a more involved practice that register clerks do not ordinarily undertake. (Mulvey Dep. at 51-52.) Plaintiffs' manner of wording their statement reflects that they recognize this fact: "BCF's computerized inventory tracking system *would have enabled* cashiers to determine whether the items returned by Mr. Clark had ever been received into inventory and sold by BCF." (Pls.' Additional Statement ¶ 27 (emphasis added).)

was five and learned English in school. (Pls.' Response ¶¶ 59-62; Pls.' Additional Statement ¶¶ 8-10, 14.)

BFC has a department called the key performance indicator department that monitors and keeps records of register activity, including employee purchases and gift card redemptions. (Defs.' Statement ¶ 18.) According to Melissa Foley's deposition testimony, which the parties cite in support of their statement and qualification, respectively, computer software flags certain register activity for follow-up. One flag involves employee use of a gift card if the gift card was issued to a different customer. (Id. ¶ 19; Pls.' Response ¶ 19; Foley Dep. at 62.) In November 2007, Melissa Foley and Edward Mulvey received a report from the KPI system that resulted in a follow up inquiry concerning the use of such gift cards by Rivera's wife and Molina's girlfriend. (Defs.' Statement ¶¶ 19-20; Foley Dep. at 63.) Upon investigation, they discovered that, in exchange for returned merchandise presented on more than one occasion,[3] register clerks in BCF's Bangor store issued five gift cards to one John Clark totaling $1,049.95. (Defs.' Statement ¶¶ 20, 26-28.) Thereafter, other individuals used those gift cards for purchases to which an employee discount was applied. (Id. ¶¶ 20-21.) In all, three employees' discounts were involved and two of those employees were Molina and Rivera. (Id. ¶¶ 22-23, 29.) Mulvey contacted Shepherd and relayed the information obtained from the computer report and told Shepherd that Rivera, Molina, and a third employee were "connected" with Mr. Clark's fraudulent[4] returns. (Pls.' Additional Statement ¶ 107.) Shepherd then reviewed that information and collected

---

[3] Plaintiffs report that there was one non-receipted return on each of the following days: October 23, 30, and 31, and November 2 and 3, 2007. The items were a $125 sport coat and four suits, each priced at $230.99. (Pls.' Additional Statement ¶¶ 51-52.)

[4] Mr. Mulvey expressed the view that the items Clark returned were stolen. However, in his deposition testimony he allowed that the items might have been purchased from another BCF store. He did not recall checking every store. (Pls.' Additional Statement ¶ 115; Mulvey Dep. at 114-15.) The point is only that, although both parties reference a fraudulent scheme in their statements, their record citations do not clearly establish that the items were stolen.

4

additional information related to the Clark returns and the employee purchases. She was able to determine that the Bangor store never had the items in inventory. (Id. ¶¶ 108-109.) A few days later, Mulvey came to the store to continue the investigation. During that visit he interviewed Molina and Rivera in Shepherd's presence and obtained statements from both men.[5] (Defs.' Statement ¶ 30.)

Following the interviews, Mulvey and Foley both spoke with Bombardier. (Id. ¶ 54.) Mulvey concluded that Molina and Rivera should have reported the gift card purchases and communications that they and/or their wives had with Clark. (Id. ¶ 55.) Foley testified at her deposition that she told Mulvey that she felt Molina and Rivera recognized that Clark's conduct was suspicious. Foley also testified that she concluded the men deserved to be fired because they knew Clark sold the cards at a discounted rate, which was suspicious, and they took advantage of the situation when they should have reported it. On the other hand, Foley concluded that there was no basis to infer that Molina and Rivera had any prior dealings with or relationship with Clark. (Id. ¶ 56; Foley Dep. Vol. I at 96-98.) The Plaintiffs offer a qualification stating that Foley had no real basis to infer that either of them regarded Mr. Clark as suspicious. They also deny ever suggesting to Foley that they knew the cards were sold at a greatly reduced rate. (Pls.' Response ¶ 56.)

Following this investigation, BCF terminated all three employees who purchased gift cards from Clark.[6] (Defs.' Statement ¶ 24.) BCF offers a summary judgment affidavit from Bombardier in which she attests that, in her role as "human resources business partner," she "authorized" the termination of Molina and Rivera based on Foley's recommendation. (Id. ¶ 57.)

---

[5] According to Rivera, Shepherd was not present for the entire Rivera interview. (Pls.' Response ¶ 30.) This is disputed but it does not appear to be material in the final analysis.
[6] The third employee terminated by BCF is African American. (Pls.' Response ¶ 25.)

Plaintiffs say that this proffer does not add up because Bombardier has previously stated, under penalty of perjury, that "it was not [her] role to make the final decision as to whether to terminate particular employees" and that, "the general practice was for the appropriate manager, which in this case . . . would have been the district manager, Ed Mulvey, to make the final termination decision." (Pls.' Response ¶ 57, citing Bombardier Decl. of Nov. 11, 2010, Doc. No. 35.) BCF justifies the terminations based on "loss of confidence." BCF's position is that Molina and Rivera should have recognized that Clark's multiple offers to sell gift cards for significantly less than cash value was suspicious activity that should have been reported to management. (Defs.' Statement ¶ 63.)

Rivera offers qualifications suggesting that he lacked personal knowledge of the gift card exchange until Mulvey told him about it during his interview. Rivera explains that his wife purchased gift cards from Clark and that he was not present when she did so. (Id. ¶¶ 31-32.) According to BCF, Rivera told Mulvey during his interview that he had been approached by Clark to purchase gift cards on another occasion and knew about his wife's purchase of gift cards. (Id. ¶ 33.) Rivera denies this statement and supports his denial with his deposition testimony and a summary judgment declaration. (Pls.' Response ¶ 33.) On the other hand, in a letter from Rivera's counsel to Patricia Ryan, Executive Director of the Maine Human Rights Commission, it was written that Rivera found out about the purchase from his wife the evening after it happened. (Defs.' Statement ¶ 34, citing Kimberly Rivera Dep. Ex. 24 at 5.) Rivera's complaint says the same: "Plaintiff Rivera was not present on October 27, 2007 when his wife purchased the second gift card and learned about the gift purchases when he returned home from work." (Am. Compl. ¶ 38.) If this alternative version is true, then Rivera would have known of Clark's sale of gift cards to his wife prior to his interview with Mulvey. Nevertheless, Rivera

6

swears that this is not accurate. According to his sworn testimony, Rivera did not learn of his wife's purchase of any gift cards from Clark until his interview with Mulvey and Shepherd and first discussed it with his wife upon returning home from that interview. (Pls.' Response ¶ 34; Pls.' Additional Statement ¶¶ 139-140.) The primary thrust of these evidentiary offers is that Rivera wants to undercut BCF's ability to fault him for failing to report these events to management. Rivera says he could not have done so because he did not know. (Defs.' Statement ¶ 35; Pls.' Response ¶ 35.) In furtherance of this position, Rivera has testified that Clark never approached him, personally, to purchase a gift card. (Defs.' Statement ¶ 37.)

Molina has admitted that he and his wife (then fiancé) were approached by Clark on two occasions and that, on the second occasion, his wife purchased for $120.00 a gift card having $230.00 in store credit. (Id. ¶ 38.) Molina has also reported that, on the first occasion, Clark explained that he had purchased a number of suits for a conference that was canceled and wanted to recover some of the money to pay for certain car expenses. (Id. ¶ 39.) Molina does not deny this statement, but offers a qualification about a separate incident in which Clark approached Mrs. Rivera (allegedly) when he was not present. (Pls.' Response ¶ 39.) This qualification does not assist him. BFC states that Molina never reported any suspicious activity to management and Molina's only qualification is that he did not regard the situation as suspicious. (Defs.' Statement ¶ 40; Pls.' Response ¶ 40.)

In connection with BCF's investigation, Molina produced a written statement. (Molina Dep. Ex. 8.) In that statement, Molina reported that he and his wife spoke with Clark and that "we" purchased one gift card on an occasion when they spoke with Clark inside the store. (Defs.' Statement ¶ 41.) In subsequent deposition testimony, Molina swears that his wife had already completed the transaction when he came upon her and Clark talking in the store. (Id. ¶ 43.)

7

Molina's statement and his deposition testimony also indicate that Clark approached Molina once when Molina was in Rivera's company. (Id. ¶ 42.) However, Rivera swears that he was not in close proximity to Molina on this occasion and that Clark did not speak to him but to Molina. Rivera says he later asked Molina what it was about and that Molina just told him the man wanted to sell him something. (Pls.' Response ¶ 42; Pls.' Additional Statement ¶¶ 96-100.)

Plaintiffs contend that their terminations were unduly harsh penalties in comparison to BCF's treatment of the clerks who issued the gift cards to Clark. They note that, following their terminations, BCF modified its employee policies to clearly state that employees may not purchase gift cards from customers and state that this expectation was previously unknown to them. (Pls.' Additional Statement ¶¶ 39-40.) They also report that BCF was very lenient on the Caucasian register clerks who accepted the returns from, and issued the gift cards to, Clark. What the record reveals on this issue is that four different clerks handled five separate returns. Only one of the clerks handled two returns. (Id. ¶¶ 113, 119.) At most, that clerk was told that he could no longer approve returns, but this "discipline" was not documented in his personnel file. (Defs.' Statement ¶ 70; Pls.' Additional Statement ¶ 193.)

Plaintiffs' statement concerning the gift card transactions is based primarily on the testimony of their wives. According to the wives, the first gift card exchange took place late in October in the presence of register clerk Danielle Romano.[7] Though Ms. Romano denies it, Mrs. Rivera states that she asked Ms. Romano whether she could use her husband's employee discount if another person paid for her purchase. When Ms. Romano said yes, Clark supplied Romano with a gift card and Mrs. Rivera paid cash to Clark at the register. (Pls.' Additional Statement ¶¶

---

[7] Ms. Romano accepted a return of a suit from Clark on November 3, 2007, and issued a gift card to him on that date. (Pls.' Additional Statement ¶ 113.) On the occasion described by the wives, Ms. Romano was accepting an earlier gift card in payment.

8

59-61.) Later, in the parking lot, Clark offered to sell the balance on the card to Mrs. Rivera for half the card's value, in cash, and she accepted. (Id. ¶ 69.) Mrs. Rivera purchased another gift card from Mr. Clark for a similar discount a few days later. (Id. ¶ 82.) Mrs. Rivera denies ever telling Mr. Rivera of these transactions. (Id. ¶ 84.) BCF denies this statement, noting that it conflicts with other evidence discussed above and also with findings issued by the Maine Human Rights Commission, which found that both wives testified they told their husbands on the evening of their initial purchases of gift cards from Clark. (Defs.' Reply ¶ 84.) Molina's wife (then fiancé) also purchased a gift card from Clark on similar terms. (Pls.' Additional Statement ¶¶ 87-88.)

The foregoing presentation offers a relatively tepid affair. Even if the Court accepts everything that Plaintiffs and their wives are saying in the context of this litigation, it still would not follow that Mulvey and Shepherd were required to believe whatever they said and could not have lost confidence in them as employees as a result of this episode. That would afford a legitimate basis for termination. However, Molina and Rivera swear that Mulvey made inappropriate comments during the interviews to the effect that their Puerto Rican background would make them familiar with corrupt practices. If Mulvey truly made such statements, it might support an inference that this viewpoint explains why termination resulted rather than some lesser discipline. The factual presentation follows.

On November 13, 2007, Mulvey separately interviewed Rivera and Molina. Ms. Shepherd sat in on these interviews. Rivera says that Shepherd was absent for a part of his interview. Shepherd says she did not leave. (Id. ¶¶ 120, 141; Defs.' Reply ¶ 120.) It does not appear to be a material dispute. During the Rivera interview, Mulvey explained that a John Clark had returned stolen suits in exchange for gift cards and that Rivera's wife had made

9

purchases with several of those gift cards using Rivera's employee discount. (Pls.' Additional Statement ¶ 124.) Rivera acknowledged that he had signed receipts allowing use of his employee discount for his wife's purchases (at a later time), but says he explained to Mulvey that he knew nothing about the stolen merchandise or about his wife purchasing any gift cards. (Id. ¶ 125.) Rivera says Mulvey asked him about Molina, whether he knew why Molina had moved to Maine, and whether he thought Molina was "running from somewhere." (Id. ¶ 126.) Rivera says that Mulvey then said: "You're Puerto Rican. You know what's going on … look, you're Puerto Rican. Come on, man, don't be stupid. You're Puerto Rican. You know that. You know why Joel's here. You know what Joel is doing." (Id. ¶ 128.) Rivera says that Mulvey stated he should "know what's going on" because he was "from the streets" and "from the ghetto." (Id. ¶ 129.) At the close of the interview, Mulvey informed Rivera that he was suspended pending further investigation. (Id. ¶ 134.) Mulvey asked Rivera to write a statement and Rivera did so in Spanish. (Id. ¶ 135.) If a translated version of that statement is part of the record, the parties have not brought it forward.

During the Molina interview, Shepherd was again in attendance and there is no suggestion that she left. (Id. ¶ 141.) Mulvey told Molina that they were conducting an investigation because several stolen suits had been returned in exchange for gift cards and someone had made purchases with one of those gift cards using Molina's employee discount. (Id. ¶ 142.) According to Molina, Mulvey stated: "I know. I got your background history. You come from Puerto Rico. I know how you guys do stuff down there. Let me know how it happened." (Id. ¶ 143.) Molina says that Mulvey described him as a Puerto Rican "from the ghetto," "the street," and the "hood." (Id. ¶¶ 144- 145.) Molina says he told Mulvey and Shepherd that he did not know anything about stolen suits or stolen gift cards and that he had not

considered Clark's conduct suspicious. (Id. ¶ 147.) At the close of the interview, Mulvey told Molina he was suspended pending further investigation. (Id. ¶ 148.) Mulvey also asked Molina to write a statement, and Molina complied. (Id. ¶ 149.)

Mulvey and Shepherd deny ever taking notes of either interview. (Id. ¶¶ 152-153.) Mulvey orally reported his conclusions to Ms. Foley, the regional loss prevention specialist. (Id. ¶ 155.) Mulvey told Foley that Rivera and Molina worked in receiving and maintenance and therefore they would have had access to merchandise as it came in the back of the store. (Id. ¶ 156.) Mulvey also reported to Foley that both Rivera and Molina had told him that John Clark approached them selling discounted gift cards and that both men had agreed that the conduct was suspicious. (Id. ¶¶ 157, 159.) Molina and Rivera swear that they never said these things to Mulvey and that his representations to Foley were not accurate. (Id. ¶¶ 158, 160.)

Foley then traveled to Bangor and conducted separate interviews of Rivera and Molina. (Id. ¶ 161.) Molina declares that he told Foley that Mulvey had asked what he was doing in Bangor and had commented that he should "know how things are done" because he was "from the streets" and was "from Puerto Rico." (Id. ¶ 163.) Foley denies this. (Defs.' Reply ¶ 163.) Foley has testified that Molina and Rivera acknowledged to her that they considered Clark's conduct to be suspicious and that they told her Mulvey had not said anything about their ethnic background. (Defs.' Statement ¶¶ 52-53.) They deny this. (Pls.' Response ¶¶ 52-53.) Foley testified in deposition that she did not take notes during her interviews, whereas BCF stated in its submission to the Maine Human Rights Commission that Foley did not retain her notes from the interviews. (Pls.' Additional Statement ¶ 164.) Foley claimed to have viewed video recordings of at least some of Clark's returns and related purchases as part of her investigation. (Id. ¶ 167.) Molina and Rivera say that Foley told them during their interviews

11

that she had viewed video of them talking to Clark outside the store, that they denied it, and that they asked to see the video. (Id. ¶¶ 168-169.) Foley denies these statements. (Defs.' Reply ¶¶ 168-169.) BCF did not preserve those video recordings beyond its automatic 30-day retention period. (Pls.' Additional Statement ¶ 170.)

Mulvey told Shepherd to inform Plaintiffs that they were being terminated for "loss of confidence." (Id. ¶ 175.) By "loss of confidence," Mulvey meant that he had lost confidence in the employees because, according to him, they should have been suspicious of Clark's behavior and should have brought it to the attention of a manager. (Id. ¶ 176.) BCF was unable to identify specifically any other employee terminated for "loss of confidence" and Mulvey characterized the term as "a real[ly] broad phrase." (Id. ¶ 177.) As directed, Shepherd informed Plaintiffs that Mulvey had told her to let them know that their employment was at an end. (Id. ¶ 178.)

## DISCUSSION

Plaintiffs assert three counts in their amended complaint (Doc. No. 13). Count I alleges discrimination in the form of wrongful termination of a contractual relationship under the Civil Rights Act of 1991, 42 U.S.C. § 1981. Count II alleges race, color, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Count III alleges violation of the Maine Human Rights Act, 5 M.R.S. § 4572, on the same grounds.

The parties have briefed their summary judgment dispute in terms of a discrimination claim that is dependent on circumstantial evidence of discriminatory animus. To demonstrate a trial-worthy, circumstantial case at the summary judgment stage, Plaintiffs must be able to make a *prima facie* showing and their evidentiary presentation must also be sufficient to allow a finder

12

of fact to reject BCF's justification and infer that race discrimination was a determinative factor in the termination decision. The *prima facie* test imposes four low hurdles for the plaintiff to clear. The pretext contest follows the more rigorous burden-shifting praxis of McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973). This order of proof is applicable to all three of Plaintiffs' claims. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1 (1993) (Section 1981) (citing Patterson v. McLean Credit Union, 491 U.S. 164, 186-87 (1989) (partially superseded by statute on an unrelated issue)); Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (Title VII and Section 1981); cf. Cookson v. Brewer Sch. Dep't, 2009 ME 57, ¶ 14, 974 A.2d 276, 281 (Maine Human Rights Act—failure to hire).

The four elements of a *prima facie* discrimination claim are: (1) membership in a protected class; (2) job performance at an acceptable level; (3) termination; and (4) replacement by another individual having similar qualifications. Windross v. Barton Protective Servs., 586 F.3d 98, 103-104 (1st Cir. 2009). Upon a successful showing, the burden of presenting evidence shifts to the defendant and the pretext contest ensues. First, the defendant must introduce a legitimate, non-discriminatory justification for termination and support it with admissible evidence. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001). Thereafter, the plaintiff must marshal the evidence in a manner that would enable a fact finder to conclude that the Defendants' justification is a pretext, or cover-up, and that a discriminatory motive was a determinative factor in the termination decision. Id. at 34.

**A.    The *Prima Facie* Contest**

BCF argues that Plaintiffs cannot clear the second *prima facie* hurdle because the decision makers in question concluded that Plaintiffs benefitted from gift card transactions with a person whose conduct might be regarded as objectively suspicious to the average person, thereby

13

falling short of BCF's code of conduct that required them to report suspicious happenings to management. (Mot. for Summ. J. at 10-11.) Assuming for the sake of argument that the finder of fact would fault Plaintiffs on this score, a bigger picture still remains that incorporates BCF's own judgment in regard to the severity of its response and in regard to the interpretation of its policies. In any event, because the Plaintiffs' supposed poor judgment in regard to the Clark encounters is the determinative factor asserted by BCF in support of its termination decision, it is really a matter for the pretext analysis rather than the *prima facie* analysis.

Discriminatory motive can be a determinative factor in an employment decision even if the employer can point to an error in judgment on the employee's part. Moreover, the evidence supports a finding that Plaintiffs performed their work tasks at a sufficient or higher level and the decision makers in this case appear to have agreed that there was no evidence that Plaintiffs were part of an illegal scheme or had prior association with Clark. Finally, the *prima facie* burden is not onerous and the summary judgment overlay does not permit the Court to presume that Plaintiffs will be deemed unworthy of employment by the finder of fact, at least not on the facts of this case. In any event, as Plaintiffs state in their memorandum, the First Circuit has already foreclosed the kind of argument BCF advances on this issue because that argument must be evaluated as part of the pretext analysis. (Opposition Mem. at 11, citing Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 448 (1st Cir. 2009).) Because BCF does not raise a challenge to any of the other elements of the *prima facie* test, the analysis proceeds to pretext.

**B.    The Pretext Contest**

BCF's legitimate justification for terminating Plaintiffs is that they should have recognized that Clark's multiple offers to sell gift cards for significantly less than cash value was suspicious activity that should have been reported to management. (Mot. for Summ. J. at 12;

14

Defs.' Statement ¶ 63.) Plaintiffs allow that this justification and the evidence supplied in support of it are sufficient to carry BCF's limited burden. (Opposition Mem. at 11 n.7.) They contend that the justification is pretextual based on a collection of factors: (1) the pejorative ethnic comments that they swear Mulvey made to them in their interviews; (2) the lack of any meaningful consequences for the Caucasian register clerks who approved Clark's returns and issued gift cards to him; (3) the absence of any clear prohibition against purchasing gift cards from customers and the change of policy after this event; (4) the absence of any notes created by Mulvey, Shepherd, or Foley; (5) the failure to view Rivera's situation differently because he swears to his ignorance of the whole affair; (6) the failure to regard the entire thing as not that significant because Molina says he did not regard Clark as suspicious; and (7) the failure to prepare and preserve evidence that might tend to "exonerate" Plaintiffs, such as interview notes and video evidence. (Opposition Mem. at 11-22.) For its part, BCF attempts to excise the more potent of these factors through certain legal arguments; the idea being that whatever remains will less likely be deemed sufficient to support an inference of discriminatory motive. (Mot. for Summ. J. at 13-18.)

BCF's most focused attacks are levied at whether Mulvey's comments are suggestive of bias on the part of BCF and at Plaintiffs' contention that the Caucasian register clerks received preferential treatment when it came to punishment for the Clark matter. (Id. at 13.) BCF says that the latter contention is specious because there were four different clerks involved, meaning any individual clerk would be unlikely to grow suspicious of Clark's non-receipted returns, and also because the clerks did not stand to profit from any transaction with Clark, unlike the Plaintiffs. (Id. at 16-17.) BCF's point has a ring of common sense to it. However, it does not automatically follow that such questions must be resolved as a matter of law by the Court. Even

15

if this fact is not sufficient on its own to support an inference of pretext and/or unlawful motive, it remains part of the circumstantial presentation. That picture, of course, includes sworn testimony that Mulvey made disparaging remarks about Puerto Ricans during what turned out to be Plaintiffs' exit interviews.

As for these alleged prejudicial remarks, Mulvey and Shepherd swear they were never spoken. Nevertheless, Plaintiffs swear otherwise. BCF states the following in its summary judgment memorandum: "because all facts are taken in the light most favorable to the non-moving party at summary judgment . . . , this analysis assumes that such comments were made." (Id. at 13.) If the finder of fact were to credit Plaintiffs' testimony that Mulvey made such remarks during their exit interviews, the finder of fact would have a sufficient evidentiary basis to infer that a discriminatory motive was a determining factor in the decision to terminate Plaintiffs' employment. BCF states in its memorandum: "Even if one assumes both that Mulvey was involved in the termination decisions, and that he made the racially related comments alleged by Plaintiffs, this evidence does no more than raise a question of fact as to whether or not Mulvey harbored a discriminatory animus toward those in Plaintiffs' protected class." (Id. at 15.) BCF would have it that these alleged comments were mere "stray remarks."

Discriminatory animus on the part of Mulvey cannot be downplayed as a stray remark or otherwise marginalized in this case because the record demonstrates that the finder of fact could fairly conclude that Mulvey was the ultimate decision maker. Assuming for purposes of summary judgment that the statements were actually made, they clearly carry substantial weight, precisely because they were made squarely in the context of an interview associated with the termination decision and Mulvey was a, if not the, ultimate decision maker. Compare Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (vacating summary

16

judgment and remanding where decision maker "referred to the plaintiff, more than once, as an 'old fart' in front of other employees") with Melendez v. Autogermana, Inc., 622 F.3d 46, 54-55 (1st Cir. 2010) (affirming summary judgment for defendant where there were serious performance shortfalls and only stray ageist remarks by co-workers); Alvarado-Santos v. Dep't of Health, 619 F.3d 126, 133 (1st Cir. 2010) (affirming summary judgment for defendant where a decision maker's remarks were neither close in time to the employment decision nor related to the employment decision). Even in cases such as Melendez and Alvarado, derogatory prejudicial statements are relevant to the circumstantial picture, even if they are not sufficient to justify a finding of workplace discrimination. Dominguez, 202 F.3d at 433 n.6 ("All of these comments, with their varying levels of relevance, can properly be considered at the summary judgment stage under the *McDonnell Douglas-Burdine-Hicks* framework."). Where, as here, the statements arise in the context of a termination decision and are made by a decision maker, they generate a genuine issue of material fact for trial whether the decision maker was motivated by discriminatory animus.

This record is simply unsuited to a summary disposition so long as Mulvey's remarks are a part of the record.[8] BCF did not request that Plaintiffs' sworn testimony about Mulvey's

---

[8] In its motion, BCF raises the argument that "[t]he variance between Plaintiffs' earlier admissions and the recent changes in their testimony is not sufficient to raise questions of material fact." (Mot. for Summ. J. at 5.) This argument appears directed at Plaintiffs' assertions about their interactions with Clark, not at their assertions about what Mulvey said to them in their interviews. As far as Mulvey's alleged statements are concerned, the record presents a swearing contest between Plaintiffs, on the one hand, and Mulvey, Shepherd, and Foley, on the other. The issue about changes in how Plaintiffs have described their interactions with, or knowledge of, Clark, is not what drives this summary judgment contest. Even if it were the central issue, BCF is pushing the envelope because it has not presented a transcript of any prior sworn statements and relies instead on representations made by plaintiff's counsel, albeit representations asserted in Plaintiffs' complaint and in a position statement made to the Maine Human Rights Commission. This is not a situation in which a summary judgment affidavit is filed in an attempt to contradict prior sworn deposition testimony by the same witness. Consequently, the rule of Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001), and Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994), does not apply here. In effect, BCF has demonstrated that there are reasons to question Plaintiffs' credibility that might be demonstrated at trial by means of cross-examination. That possibility does not give rise to judgment as a matter of law in the summary judgment context.

comments be stricken from the record in its Local Rule 56 papers and I can see no legal basis for making such an argument. Instead, BCF has denied their statements and cross-referenced its own statements supported by the testimony of Mulvey, Shepherd, and Foley. (See Reply Statement ¶¶ 128-129, 144-146.) At the summary judgment stage, Plaintiffs win this swearing contest.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court DENY Defendants' Motion for Summary Judgment (Doc. No. 21). Also pending is Plaintiffs' request for oral argument (Doc. No. 28). I have seen no reason for an oral presentation in regard to the instant recommendation, but I leave this request undisturbed on the docket in case the Court wishes to hear from the parties in connection with any objections to this recommendation.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 29, 2011